CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

GEORGE O. HAGEMAN (CABN 332457)
JARED S. BUSZIN (NYBN 5285838)
Assistant United States Attorneys

    60 South Market Street, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-5044
    George.Hageman@usdoj.gov
    Jared.Buszin@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>SALVADOR MEXICANO a/k/a "Jumpshot,"<br><br>    Defendant. | **CASE NO. 5:24-CR-00226-BLF-007**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Court:         Hon. Beth L. Freeman<br>Hearing Date:  January 13, 2026<br>Hearing Time:  9:00 a.m. |

## I. INTRODUCTION

Salvador Mexicano is one of the more violent members of the Salinas Acosta Plaza (SAP) Norteños. When he was 17 years old, he was a shooter in two separate incidents in September 2020 and March 2021, resulting in the deaths of two victims and the wounding of a third. Both occurred in the wooded Carr Lake area near the Acosta Plaza townhomes where a large number of vulnerable transient persons reside, and both contributed to his status as an up-and-coming member of the gang. The defendant continued his involvement in the gang after he turned 18, but those two shootings remain his most significant and severe criminal conduct. In August 2025, he admitted to his role in both shootings—neither of which was attributed to him by name in the indictment—and agreed to a sentence of just below the statutory maximum. Based on the need for the sentence to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, and to protect the public, the government submits that 228 months' (19 years) imprisonment is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a).

## II. PROCEDURAL HISTORY

On April 18, 2024, the defendant and ten other members of SAP were indicted by a federal grand jury on one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Dkt. 1. Unlike most of the other defendants, the defendant was already in state custody and thus was brought over to federal custody by writ on June 4, 2024. PSR ¶ 3. On August 26, 2025, the defendant pleaded guilty to the sole count. Dkt. 303. Sentencing is currently set for January 13, 2026.

## III. OFFENSE CONDUCT

a. *The Enterprise: Salinas Acosta Plaza (SAP)*

SAP is a criminal street gang that operates in Salinas, CA, within the larger collection of Norteño criminal street gangs that align with the Nuestra Familia (NF) prison gang and funnel taxes and proceeds from their crimes on the street to Nuestra Familia gang members in prison. Norteño gang members associate with the color red, and the number "14" (signifying "N" as the 14th letter of the alphabet), including any variations of the number such as "4" and "XIV." PSR ¶ 10.

SAP originated in the 1990's in the Acosta Plaza apartment complex in Salinas at and around the

900 block of Acosta Plaza. The gang claims that apartment complex as its territory. SAP commonly uses the letters and numbers "SAP," "A," "P," "900" and "914," as well as the color red, to identify itself. SAP members also commonly wear clothing of the Atlanta Braves and Philadelphia Phillies baseball teams to represent the gang, given that the symbols of these teams prominently feature the letters "A" and "P". *Id.* ¶ 11. These symbols are commonly, though not universally, displayed by SAP members in tattoos, graffiti, drawings, hand signs, on clothing, and in photos, rap videos, and social media posts as a way of displaying their affiliation, loyalty, and commitment to the gang. *Id.* ¶ 12.

SAP's primary rivals are Sureño criminal street gang members. Sureños recognize the primacy of the Mexican Mafia prison gang, doing the bidding and following orders of Mexican Mafia members. For symbols, they claim the color blue and the number 13 (M is the 13th letter of the alphabet). The rivalry between Norteño and Sureño gang members in Salinas has resulted in numerous acts of violence, including murders, attempted murders, shootings, and assaults. Additionally, SAP members very often target victims who they perceive to be Sureño gang members but who are not actually gang-affiliated, which has led to several murders and attempted murders of non-gang-affiliated victims. *Id.* ¶ 13

In order to gain entry into the gang, aspiring SAP members may be encouraged or required to put in "work," which is understood to mean criminal conduct such as shootings, robberies, and drug sales. SAP members gain admission, earn status and respect, and rise in rank by committing criminal acts that benefit the gang and/or by spending time in jail or prison for the same. *Id.* ¶ 14. SAP members engage in acts of violence, including acts involving murder and assault, against their rivals and, at times, fellow Norteños considered to have violated the gang's rules. SAP members also traffic in controlled substances and firearms. Violence is often the quickest way to gain admission and/or status for the individual gang member. Members are also expected to pay dues to the gang, with greater dues required of those members who traffic in controlled substances. The dues are used, in part, to acquire firearms for distribution, possession, and use by SAP members. *Id.*

SAP members meet and work together to carry out illegal activities for the benefit of SAP and its membership, and also to benefit, more generally, the Norteños and the NF. SAP members fight with other street gangs for control of territory from which they conduct drug trafficking and other crimes, and recruit

and intimidate non-gang members. SAP members engage in acts of violence and intimidation to control illegal activities, to claim or maintain established territory, to retaliate against a rival gang or suspected rival gang member, to earn notoriety and respect, to dissuade potential victims and witnesses from reporting crime or cooperating with law enforcement, to discipline fellow gang members, and to send a message to others that they are strong, powerful, and not to be provoked. *Id.* ¶ 15.

    b. *Defendant's Role in SAP*

From at least May 2014 and continuing through at least April 2024, the defendant has been an SAP Norteño gang member or associate. *Id.* ¶ 17. During this time, he agreed to conduct and to participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. As an Enterprise member, he knew and agreed that Enterprise members would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise, including acts involving murder, robbery, narcotics trafficking, and witness intimidation – all in service of the Enterprise and its interests. He has "SAP" tattooed on his chest, one dot tattooed on his right elbow, four dots tattooed on his left elbow (together representing "14" because N is the 14th letter of the alphabet). *Id.* He wears these tattoos to demonstrate his membership in the gang.

On September 20, 2020, when he was 17 years old, the defendant and three other SAP associates walked into the dark wooded Carr Lake area behind the Acosta Plaza townhomes in Salinas, CA. *Id.* ¶ 18. They encountered two transient men who they believed were associated with a rival gang. They carried a .380 caliber handgun and a 9mm caliber handgun. The group of SAP associates asked the two transient men about their gang affiliations and told them to take off their clothing so that they could check them for gang tattoos. The SAP associates asked the men to get on their knees. The defendant then shot one of the men in the head with his handgun. One of the other SAP associates shot at the other man in the head with his handgun. One of the victims died. The other victim was shot in the head but conscious, breathing, and speaking with the police officers on scene; he would survive. In the weeks after the shooting, the defendant got an "SAP" tattoo on his chest to reflect the fact that he was now a certified member of SAP.

On March 23, 2021, when he was 17 years old, the defendant and one other SAP associate walked into the dark wooded Carr Lake area behind the Acosta Plaza townhomes in Salinas, CA. *Id.* ¶ 19. They

encountered a transient man they believed was associated with a rival gang. They carried a 9mm handgun. They asked the man about his gang affiliation and told him to take off his clothing so they could check him for gang tattoos. They shot him in the chest and he died. Afterwards, they inadvertently left behind a 9mm magazine with the defendant's DNA at the scene.

On April 27, 2021, when he was 17 years old, the defendant and three other SAP associates confronted a suspected rival gang member inside Northridge Mall in Salinas, CA. *Id.* ¶ 20. The defendant approached the victim, asked him about his gang affiliation, and grabbed the gold chain necklace off of his neck. In the ensuing fight, the defendant punched, kicked, and grappled with the victim. The three other SAP gang members and the defendant then ran out of the mall, drove to a different shopping center across the street, and went their separate ways to avoid detection. The defendant was subsequently charged, convicted, and sentenced for robbery in Monterey County Juvenile Court. *Id.* ¶ 58.

On November 28, 2022, when he was 19 years old, he was caught in possession of 14.8 grams (gross) of cocaine, several baggies of marijuana, several empty plastic baggies, a digital scale, and $1,025 in cash. *Id.* ¶ 21. He was subsequently charged, convicted, and sentenced in Monterey County superior Court. *Id.* ¶ 59. His intent was to sell these controlled substances. He sold these drugs for personal profit and to pay gang dues to SAP leaders. He would also sometimes take on a leadership role by collecting gang dues from other gang members; he did so on at least one occasion in October 2022. *Id.* ¶ 21. Also in November 2022, when he was 19 years old, he trafficked firearms despite not having a firearms dealing license. *Id.* He conspired with other SAP gang members to purchase multiple firearms of varying calibers.

On January 31, 2023, when he was 19 years old and incarcerated at Monterey County Jail, several Norteño inmates in his housing unit participated in a "removal" whereby they beat and stabbed another inmate who they believed required discipline. *Id.* ¶ 22. Immediately after the attack was stopped, the defendant helped one of the attackers dispose of the evidence by flushing his bloody shirt down the toilet in his cell. He was subsequently charged, convicted, and sentenced for being an accessory (with a street gang enhancement) in Monterey County Superior Court. *Id.* ¶ 60.

## IV.   SENTENCING GUIDELINES CALCULATION

    *a. Guidelines Range*

The government agrees that the base offense level is 46 after grouping, minus 3 for acceptance of responsibility, resulting in a total offense level of 43. *Id.* ¶ 54. The government also agrees with the calculation of criminal history category V. *Id.* ¶ 63. Together, the guidelines range is 240 months based on the statutory maximum for racketeering conspiracy. *See id.* ¶ 90; *see also* 18 U.S.C. § 1963(a).

    b.  *Juvenile Acts*

At the change of plea hearing, the Court asked the government to be prepared to discuss how the defendant's juvenile status at the time of the murders affects the guidelines calculation. In short, it does not. The Juvenile Delinquency Act (JDA) does not apply because his crime (that is, racketeering conspiracy) continued even after he turned 18 as described above. *See United States v. Camez*, 839 F.3d 871, 874 (9th Cir. 2016) (holding that when the defendant is under 21 at the time of indictment but committed a "continuing crime[] alleged to have occurred both before and after the defendant turned 18," "courts uniformly have held that adult prosecution is warranted"); *see also* 18 U.S.C. § 5031 (defining juvenile defendants as those who committed crimes while under the age of 18 and are under the age of 21 at the time of indictment). Nor does the JDA preclude consideration of the defendant's juvenile acts at trial. *See Camez*, 839 F.3d at 876 ("In sum, we adopt the prevailing view that, for prosecution of a defendant indicted at age 18, 19, or 20, pre-majority acts may be admitted as substantive proof of a continuing crime such as the substantive RICO count here.").

At sentencing, the type of information or conduct that the Court may consider is even broader than at trial. *See generally United States v. Vanderwerfhorst*, 576 F.3d 929, 935 (9th Cir. 2009) ("A sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come."); *see also* 18 U.S.C. § 3553(a)(1) (stating court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant" without noting any limitations on the consideration of juvenile conduct). The Guidelines Manual is similarly broad in scope and without any specific limitation on the consideration of juvenile conduct. Unlike in the criminal history chapter (chapter 4) where there are specific rules on how juvenile convictions may or may not be scored, *see, e.g.*, U.S.S.G. § 4A1.2 app. n.7, there is no such limitation for juvenile acts in the offense level section (chapter 2) of the Guidelines. If the defendant fell under the JDA,

then the Guidelines would not apply, but as stated above, the JDA does not apply here. *Cf.* U.S.S.G. § 1B1.12 ("The sentencing guidelines do not apply to a defendant sentenced under the Federal Juvenile Delinquency Act (18 U.S.C. §§ 5031–5042). However, the sentence imposed upon a juvenile delinquent may not exceed the maximum of the guideline range applicable to an otherwise similarly situated adult defendant . . . ."). Accordingly, the base offense level is 43 for first degree murder and 33 for attempted murder, regardless of the defendant's age when he committed it. *See generally* U.S.S.G. § 2A1.1; *see also United States v. Williams*, No. 4:23-cr-55, 2024 U.S. Dist. LEXIS 225471, at *3 (E.D. Va. Dec. 12, 2024) ("an individual's base offense level is determined by the type of crime at issue and the defendant's role in that crime; criminal history—adult or juvenile—plays no part in that calculation"). The Court may have been able to depart downward based on the defendant's age under U.S.S.G. § 5H1.1 prior to the amendments on November 1, 2025, but even that does not preclude the use of juvenile acts in calculating a defendant's offense level. *See* U.S.S.G. § 5H1.1 (2024).

**V.   APPLICABLE LAW**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense; (3) the need for the sentence to afford adequate deterrence; (4) the need for the sentence to protect the public from further crimes of the defendant; (5) the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need

to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

## VI.     RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS

Upon consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a)—and in particular the need for the sentence to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, and to protect the public—the government respectfully recommends a sentence of 228 months' (19 years) imprisonment, just below the statutory maximum of 240 months.

At first glance, the recommendation of the parties and Probation may seem low given that the defendant is personally responsible for two murders (and one attempted murder).  Both incidents, which targeted already vulnerable transient men living near Acosta Plaza and involved execution-style killings, are unquestionably appalling.  Even though these men may not have had the same family or community connections by virtue of their homelessness, that does not make their deaths any less tragic.  The fact that the defendant clearly participated in both in order to get "certified," "earn" a tattoo, and generally increase his standing within the gang is also abhorrent.  He also has a very high criminal history category (V).  Nevertheless, the government believes 228 months is the appropriate sentence.

First, there is the defendant's youth.  He was 17 years old at the time of both murders, and he is 22 years old now.  While the age policy statement was deleted from the Sentencing Guidelines as of November 1, 2025, along with all the other "specific offender characteristics," the underlying principles remain and may still be considered under 18 U.S.C. § 3553(a)(1) as "history and characteristics of the defendant."  *See* U.S.S.G. § 5H1.1 (2025).  Those principles include the fact that his brain is still developing, he is more impulsive, and he is more susceptible to outside influences.  *See generally* U.S.S.G. § 5H1.1 (2024).  He unfortunately grew up in the gang from a very young age and has multiple family gang connections including his older brother (and co-defendant) Jose Mexicano and his cousin (and co-defendant) Sergio Hernandez.  His father was sentenced to a multi-decade prison term when he was five years old, PSR ¶ 70, and his two close friends were shot to death, *id.* ¶ 75.  None of that in any way excuses what he did.  A 17-year-old with a difficult upbringing still knows right from wrong.  But it is a factor.

Second, there is the defendant's acceptance of responsibility.  He was willing to admit to his involvement in both murders even though the initial indictment does not attribute those to him by name.

By making these admissions at the time that he did, he essentially waived indictment and saved the government the time and expense of having seek a superseding indictment as to him from the grand jury. Though the government's evidence tying the defendant to both murders has been steadily improving with further investigation, the defendant's acceptance of responsibility also stands out because he admitted to his involvement in these murders notwithstanding the fact that they presented triable issues at the time he agreed to plead guilty. With his admissions, he thus provided closure to the victims' families that the government might not have been able to obtain at trial.

## VII. VICTIM IMPACT AND RESTITUTION

As of this filing, the government has not received any Victim Impact Statements for the defendant's sentencing. The government is also not aware of any victims who wish to speak at sentencing, or any restitution requests, at this time. If any of the above are received prior to or at sentencing, the government will inform the Court.

## VIII. CONCLUSION

Salvador Mexicano was one of the primary shooters among the Salinas Acosta Plaza (SAP) Norteños. He is also one of its younger members and was under 18 at the time of the shootings themselves. By accepting responsibility for both shootings, he provides some measure of closure to the victims and their families. The government hopes that this sentence of 228 months will put the defendant on a corrective course such that once he is released many years from now, definitely no longer a young man, he will be able to start rectifying some of the terrible harm he has caused so far in his short life.

DATED: January 6, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/*
GEORGE O. HAGEMAN
JARED S. BUSZIN
Assistant United States Attorneys