Matthew Dirkes (State Bar No. 255215)
matt@illovskygates.com
ILLOVSKY GATES & CALIA LLP
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640

Attorney for Defendant
Salvador Mexicano

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 5:24-cr-00226-BLF-7 |
| Plaintiff, | **SALVADOR MEXICANO'S SENTENCING MEMORANDUM** |
| v. | |
| SALVADOR MEXICANO, | Date:   January 13, 2026 |
| Defendant. | Time:   9:00 a.m.<br>Judge:  Hon. Beth Labson Freeman<br>Court:  1, 5th Floor |

Salvador Mexicano submits this memorandum for the Court's consideration in connection with his upcoming sentencing. He has pleaded guilty to a single count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) and entered into a plea agreement, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), in which he and the government have agreed on a sentence of 19 years. ECF No. 303 ¶ 8. The Probation Office recommends the same sentence. Presentence Investigation Report (PSR), ECF No. 381, Sentencing Recommendation at 1.

For the reasons set forth below, not the least of which is Mr. Mexicano's youth at the time of the more serious acts of racketeering activity, we respectfully urge the Court to impose the jointly recommended sentence of 19 years.

## I.    HISTORY AND CHARACTERISTICS OF MR. MEXICANO

Mr. Mexicano "survived a childhood marked by poverty and chronic community violence." Social History Report ("Report") at 1 (concurrently filed under seal). He grew up without a father, who was arrested and then sentenced to a 30-year prison term when Mr. Mexicano was five years old. PSR ¶ 70. His mother worked 12-hour night shifts to provide for Mr. Mexicano and his siblings. Report at 3; PSR ¶ 71. Although his grandparents helped raise him, they could not shield him from the surrounding neighborhood, which, by the time Mr. Mexicano was 12 years old, was deemed the youth murder capital of the country. Report at 1; PSR ¶ 71. Ultimately, Mr. Mexicano was unable to resist the descent into the violent gang activity that plagued his childhood.

Mr. Mexicano's exposure to murder began as a toddler, when his uncle was shot and killed close to the family home. Report at 4; PSR ¶ 75. Several years later, as a seven-year-old, he saw his stepfather lying dead after someone shot and killed him in broad daylight outside their home on the day of his younger sister's baptism. Report at 4. The following year, another uncle was murdered. Report at 4. Two years later, when he was ten, yet another uncle was shot, along with eight others. *Id.* In middle school, when he was 12 years old, six more people were shot and killed nearby, including a close friend. Report at 5. Two years later, another close friend died from gun violence. *Id.*

Not surprisingly, Mr. Mexicano suffered significant trauma from growing up in a neighborhood where gun violence was endemic. PSR ¶ 80; Report at 5-6. Numbness, extreme

1                    SENTENCING MEMORANDUM
                     Case No.: 5:24-cr-00226-BLF-7

anxiety, headaches, and anger were but some of the symptoms he began experiencing as a young teenager. Report at 5-6. Treatment was largely unavailable and he had no choice but to push through as best he could. In the first and second grades, his teachers described him as a "very dedicated student" who was "very well-behaved," "very polite," and a "good boy." Report at 3. At home, he helped the family in any way he could, including cleaning the apartment.

By the sixth grade, he began to struggle at school fell quickly behind. Report at 3. As school became an increasingly difficult place, stints in juvenile hall soon followed. Report at 3, 5; PSR ¶¶ 56-58. Not long after, Mr. Mexicano succumbed to the ever-present gang life – and the security and violence associated with it – that had surrounded him for as long as he could remember.

## II.    NATURE OF THE OFFENSE

Mr. Mexicano was charged with and pleaded guilty to a single count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). The charge stemmed from his involvement in the Salinas Acosta Plaza (SAP) gang, which was rooted in the impoverished community where Mr. Mexicano grew up. Additional details regarding the offense conduct and admitted acts of racketeering activity are set forth in the plea agreement. ECF No. 303.

## III.    A SUFFICIENT AND FAIR SENTENCE

A sentence must be "not greater than necessary" to "provide just punishment," deter criminal behavior, and protect society. 18 U.S.C. § 3553(a). The jointly recommended sentence of 19 years satisfies those considerations.

"The Supreme Court has consistently instructed that 'the punishment should fit the offender and not merely the crime,' and thus judges should use 'the fullest information possible concerning the defendant's life and characteristics' to determine the appropriate sentence." *United States v. Trujillo*, 713 F.3d 1008-09 (9th Cir. 2013) (quoting *Pepper v. United States*, 131 S. Ct. 1229, 1235, 1240 (2011)).

As noted in the PSR, a downward variance from the Guidelines range of 20 years is appropriate given Mr. Mexicano's "exposure to crime, violence, and deaths throughout his life," as well as the absence of his father for virtually all of his life. PSR, Sentencing Recommendation at 3.

A longer sentence would not further any of the remaining statutory factors.  The jointly recommended sentence will more than satisfy the need for specific deterrence.  18 U.S.C. § 3553(a)(1)(B).  When he is eventually released, Mr. Mexicano will be decades older than when he engaged in the racketeering activity and he'll have been long-removed from the neighborhood and violence that have led him to this point in his life.  There is nothing to suggest that a longer sentence will lead to a reduced risk of recidivism.  In fact, the Department of Justice itself has concluded that longer sentences do not increase deterrence.  The National Institute of Justice, the research, development and evaluation agency of the Department of Justice, stated in 2016 that "the chance of being caught is a vastly more effective deterrent than even draconian punishment."[1]  "[P]rison sentences (particularly long sentences) are unlikely to deter future crime."[2]  In fact, prison sentences may actually lead to increased future criminal behavior:  "Persons who are incarcerated learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."[3]

For similar reasons, the parties' recommended sentence will also protect the public from future crimes by Mr. Mexicano.  18 U.S.C. § 3553(a)(1)(C).  While in prison serving a lengthy sentence, he'll have, for the first time, the opportunity to develop skills that he'll be able to use to build a productive and law-abiding life upon his eventual release.  He will be a different person when that day arrives.

As for general deterrence, 18 U.S.C. § 3553(a)(1)(B), the government's efforts to prosecute Norteño-affiliated gangs in Northern California have been well publicized. https://www.sfchronicle.com/bayarea/article/s-f-gang-member-sentenced-7-years-prison-gun-20299454.php; https://www.kron4.com/news/bay-area/11-sap-nortenos-south-bay-street-gang-members-charged-for-racketeering/; https://www.eastbaytimes.com/2025/12/18/bay-area-man-gets-17-months-for-norteno-gang-plot-to-rip-off-union-city-drug-house/; https://www.justice.gov/usao-ndca/pr/three-norteno-gang-members-who-murdered-victims-san-francisco-sentenced-decades-

---

[1] https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last visited July 3, 2023).

[2] *Id.*

[3] *Id.*

prison.  Given the number of press releases relating to federal prosecutions of suspected Norteño gang members, Mr. Mexicano's sentence, whatever it ultimately ends up being, likely will have little impact on what others in similar situations decide to do in the future.

Finally, and most importantly, in reaching an appropriate sentence, the Court should consider Mr. Mexicano's status as a juvenile at the time of the more serious acts of racketeering activity.  As the Supreme Court has noted, the differences between juvenile and adult offenders include "[a] lack of maturity and an underdeveloped sense of responsibility [that] often result in impetuous and ill-considered actions and decisions."  *Roper v. Simmons*, 543 U.S. 551, 569 (2005).  That characteristic suggests that "juvenile offenders cannot reliably be classified among the worst offenders."  *Id*. Moreover, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," which, again, means that "their irresponsible conduct is not as morally reprehensible as that of an adult."  *Id.* at 569-70 (internal quotation marks omitted).

Mr. Mexicano was 17 when he and others engaged in two separate shootings of suspected gang rivals.  Plea Agreement, ECF No. 303, ¶ 2(h), (i).  "[T]he latest adolescent brain development research shows that the developmental period from adolescence through emerging adulthood features the creation of new neural pathways and the enhancement of connections between brain systems and neural networks."  Nat'l Academies of Science, Engineering, and Medicine *et al*., The Promise of Adolescence: Realizing Opportunity for All Youth (2019) at 273.  The scientific community agrees that the human brain does not reach full maturation until at least age 25, when an emerging adult becomes fully developed.  *Id.* at 296 ("although adolescents may develop some adult-like cognitive abilities by late adolescence (roughly age 16), the cognitive control capacities needed for inhibiting risk-taking behaviors continue to develop through young adulthood (age 25)").

As a result, risky behavior peaks not during adolescence but emerging adulthood.  Scott *et al*., Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy, 85 Ford. L. Rev. 641, 644 (2016); Steinberg *et al*., Age Differences in Future Orientation and Delay Discounting, 80 Child Dev. 28, 35 (2009).  Research reveals that criminal behavior decreases persistently after age 25.  U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders (Dec. 2017), https://bit.ly/3DMG4bk (re-incarceration rate highest for individuals

released before age 25). This timeline correlates with research on when brain development is complete, rendering individuals less prone to immature behavior. Monahan *et al*., Psychosocial (Im)maturity From Adolescence to Early Adulthood: Distinguishing Between Adolescence Limited and Persisting Antisocial Behavior, 25 Dev. & Psychopathology 1093, 1093–1105 (2013).

The Supreme Court has described the "hallmark features" of youth that render young offenders categorically less culpable than fully mature offenders: "immaturity, impetuosity, and failure to appreciate risks and consequences . . . [the inability to] extricate [one]self [from a] brutal or dysfunctional [home environment] . . . [susceptibility to] familial and peer pressures . . . [and amenability to] rehabilitation . . . ." *Miller v. Alabama*, 567 U.S. 460, 477 (2012). Juveniles "are more vulnerable . . . to negative influences and outside pressures including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings." *Id.* at 471.

Mr. Mexicano exhibited all of the "hallmark features" of youth recognized by the Supreme Court. Those features – immaturity, impetuosity, failure to appreciate risks and consequences, susceptibility to peer pressure, and inability to control his environment – suggest he is less culpable than fully mature offenders and strongly weigh in favor of the jointly recommended sentence.

## CONCLUSION

For the reasons stated, we respectfully suggest that a sentence of 19 years is sufficient and no greater than necessary to impose just punishment in this case.

Dated: January 5, 2026                    ILLOVSKY GATES & CALIA LLP

   */s/Matthew Dirkes*
Matthew Dirkes

Attorney for Defendant
Salvador Mexicano